## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY LEE HATTEN,

                Plaintiff

    v.

BRYAN BLEDSOE, Warden, et al.,

                Defendants

CIVIL ACTION NO. 1:13-CV-00209

(CALDWELL, J.)
(MEHALCHICK, M.J.)

### REPORT AND RECOMMENDATION

Timothy Lee Hatten is a federal prisoner serving a thirty year sentence for a drug conviction. Appearing through counsel, Hatten initiated this action by the filing of a fee-paid complaint on January 28, 2013. (Doc. 1). The complaint alleges federal civil rights and state-law tort claims against the Federal Bureau of Prisons ("BOP"), Warden Bryan Bledsoe, and various correctional officers related to events that occurred in July 2011 while Hatten was designated to the Special Management Unit ("SMU") at USP Lewisburg, a high security federal prison located in Union County, Pennsylvania. Hatten is currently incarcerated at FCI Talladega, a medium security federal prison located in Talladega County, Alabama.

The Defendants have filed motions to dismiss and for summary judgment. (Doc. 6; Doc. 10). These motions are now ripe for decision.

### I.  BACKGROUND

This action stems from two incidents that occurred during July 2011, while Hatten was incarcerated in the SMU at USP Lewisburg.

A. THE COMPLAINT

The complaint alleges that on July 16, 2011, without cause, Hatten was placed in restraints — chains about his legs, feet, hands, arms, and torso — that "severely and substantially restricted his blood circulation and severely damaged his muscles, tendons and nerves," causing "intense and severe pain" and "permanent scars to his chest and sides." In addition, the complaint alleges that a rectangular metal box attached to the chains was forced into Hatten's chest, causing pain and restricting his breathing. The complaint avers that Hatten was stripped and chained to a chair with his hands over his head, further restricting his circulation and his breathing. The complaint alleges that Hatten had difficulty breathing and retaining consciousness while so restrained, and that he was left in these restraints for three days.

The complaint further alleges that on July 25, 2011,[1] one of the defendants told Hatten that he was going to be placed in chains again because of his complaints about medical treatment and for making and filing allegedly false reports about the July 16th incident. The complaint alleges that Hatten was subsequently placed in restraints in a similar manner to the July 16th incident, and left in those restraints for a period of 18 hours. The complaint alleges that the restraints caused Hatten "intense pain, spasms and difficult breathing or getting adequate blood circulation." The complaint alleges that, at that time, Hatten had done nothing improper or threatening.

The complaint advances eight separate causes of action. In Count One, the

---

[1] The complaint alternates between references to "July 24" and "July 25" as the date of the second incident, but in light of the evidence submitted on summary judgment, this report will settle on July 25, 2011, as the relevant date.

complaint asserts a *Bivens*[2] claim alleging the excessive use of force and deliberate indifference to Hatten's well-being in violation of the Eighth and Fourteenth Amendments arising from the July 16th and July 25th incidents, and for the failure of the BOP and Warden Bledsoe to properly regulate or supervise the use of such restraints. In Count Two, the complaint asserts a *Bivens* claim alleging that the claimed excessive use of force and deliberate indifference arising from the July 16, 2011, and July 25, 2011, incidents was in retaliation for Hatten's filing of grievances, in violation of his First and Fourteenth Amendment rights. In Count Three, the complaint asserts a claim of general negligence against all of the Defendants. In Count Four, the complaint asserts a claim of negligent failure to train or supervise correctional staff. In Count Six,[3] the complaint asserts a claim of "malpractice," alleging that the Defendants failed to provide security services consistent with the relevant standard of care applicable to the provision of penological services. In Count Twelve,[4] the complaint asserts a claim of intentional infliction of emotional distress. In Count Thirteen, the complaint asserts a claim of negligent infliction of emotional distress. Finally, in Count Fourteen, the complaint asserts a claim of assault and battery.[5] The complaint further alleges that Hatten has exhausted his administrative remedies under the

---

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[3] The complaint does not contain a Count Five.

[4] The complaint does not contain a Count Seven, Eight, Nine, Ten, or Eleven.

[5] Although the various counts of the complaint do not explicitly state the particular defendants at which each is directed, these last three counts are collected together under the heading "Pendent State Claims," suggesting that they are directed at the individual defendants only, and that Hatten asserts federal court jurisdiction over these claims under 28 U.S.C. § 1367. This is consistent with the FTCA's explicit exclusion of claims arising out of assault and battery from the scope of its waiver of sovereign immunity. *See generally* 28 U.S.C. § 2680(h).

Federal Tort Claims Act ("FTCA"), and the Defendants have conceded as much on summary judgment, acknowledging that Hatten duly filed administrative claims with respect to both the July 16th and July 25th incidents, and that both claims were denied on July 31, 2012. (Doc. 22-1, at 3).

B. DISPOSITIVE MOTIONS

The Defendants have not answered the complaint, opting instead to file motions to dismiss pursuant to Rule 12 and for summary judgment pursuant to Rule 56. The Defendants filed their first motion on April 9, 2013, seeking to dismiss Hatten's *Bivens* claims as against the BOP on the ground that they were barred by sovereign immunity. (Doc. 6; Doc. 7). The Defendants filed their second motion on May 10, 2013, seeking (1) to dismiss Hatten's FTCA claims against the BOP on the ground that they were barred by sovereign immunity, (2) to dismiss Hatten's *Bivens* claims against Warden Bledsoe for lack of personal involvement, (3) summary judgment with respect to Hatten's *Bivens* claims for failure to exhaust administrative remedies, (4) summary judgment on the merits of Hatten's *Bivens* claims; and (5) summary judgment on the issue of qualified immunity. (Doc. 10; Doc. 31). In support of summary judgment, the Defendants filed a statement of material facts (Doc. 21) and several exhibits (Doc. 22; Doc. 22-1; Doc. 22-2; Doc. 22-3; Doc. 22-4; Doc. 22-5), as well as video footage under seal for *in camera* review (*see* Doc. 11; Doc. 12).[6] Through counsel, Hatten has filed a brief in opposition to both motions. (Doc. 23). Hatten has also filed a *pro se* response to the Defendants' statement of material facts, including declarations by himself executed pursuant to 28 U.S.C. § 1746. (Doc. 34).

---

[6] The video footage contains sensitive security information concerning the prison layout and operating procedures with respect to the use of force. It has been made available to Hatten and his counsel for review.

C. The Defendants' Statement of Facts

The statement of material facts and supporting exhibits submitted by the Defendants paint a somewhat different and more robust picture of the facts than that alleged in the complaint.

On July 16, 2011, Hatten was housed in Cell 316 in I-Block. He had a cellmate. According to the Defendants' statement of facts, Defendant Crawley was attempting to place restraints on Hatten's wrists through the cell door's food slot when Hatten grabbed Crawley's left hand and pulled it through the slot. Crawley called for assistance. Hatten continued to be disruptive and assaultive and displayed signs of imminent violence. Warden Bledsoe authorized the assembly of a Use-of-Force Team ("UFT") to apply ambulatory restraints and transport Hatten to another cellblock.

When the UFT arrived at Cell 316 to escort Hatten, he agreed to submit to restraints, avoiding the necessity of forceful application of the restraints.[7] Hatten was removed from his cell, searched and medically assessed before being placed in ambulatory restraints. While being escorted by the UFT to Cell 126 in D-Block, Hatten "became combative and the [UFT] placed Hatten on the ground using the least amount of force necessary." Hatten was then secured on a portable stretcher and carried to D-Block. Upon arrival there, medical staff checked Hatten and documented that he had forced his wrist restraints up his forearms in an attempt to have staff loosen them. Hatten was left in his new cell, in restraints, and checked by staff every 15 minutes. A lieutenant performed a check every two hours. Approximately 25 hours after restraints were first applied, staff determined that Hatten appeared to have regained self-control and he was removed from restraints.

---

[7] Only one member of the July 16th UFT, R. Miller, is named as a defendant.

Defendant Crawley wrote an incident report charging Hatten with assault, which was delivered to Hatten that same day. After a disciplinary hearing on August 16, 2011, Hatten was found to have committed the prohibited act of interfering with a staff member in the performance of duties (code 298) in a manner most comparable to assault (code 224). Hatten was sanctioned with the loss of 27 days of good conduct time, the imposition of 30 days in disciplinary segregation, the loss of 180 days of commissary, telephone and visiting privileges, and impoundment of his personal property for 120 days.

On July 25, 2011, a similar incident occurred. Defendant Treibley attempted to place Hatten in restraints to return him to his cell from the video visiting room. Hatten refused to be moved back to his cell and stated that he would assault his cellmate.[8] Treibley called for assistance. Responding staff observed that Hatten displayed signs of imminent violence. Warden Bledsoe authorized the assembly of a UFT to apply ambulatory restraints and transport Hatten back to his cell.

When the UFT arrived, Hatten agreed to submit to restraints, avoiding the necessity of forceful application of the restraints.[9] Hatten was removed from the video visiting room, searched and medically assessed before being placed in ambulatory restraints. The UFT then escorted Hatten to D-Block without incident. Hatten was left in his cell, in restraints, and checked by staff every 15 minutes. A lieutenant performed a check every two hours.

_____

[8] To the extent that Hatten claims he did not threaten his cellmate, he is precluded from challenging this finding by the prison disciplinary hearing officer without first obtaining a writ of habeas corpus invalidating the disciplinary hearing and resulting sanctions. *See generally Edwards v. Balisok*, 520 U.S. 641 (1997).

[9] None of the documented members of the July 25th UFT is named as a defendant. But the complaint alleges that Defendants Treibley, Zegarski, Leisenfield, Brewer, and Fosnot were responsible for applying restraints and leaving him in them for 18 hours.

Approximately five-and-a-half hours after restraints were first applied, staff determined that Hatten appeared to have regained self-control and he was removed from restraints.

Defendant Treibley wrote an incident report charging Hatten with threatening another with bodily harm, which was delivered to Hatten that same day. After a disciplinary hearing on August 16, 2011, Hatten was found to have committed the prohibited act of threatening another with bodily harm (code 203). Hatten was sanctioned with the loss of 27 days of good conduct time, the imposition of 30 days in disciplinary segregation, the loss of 120 days of commissary, telephone and visiting privileges, and impoundment of his personal property for 120 days.

### D. Hatten's Pro Se Counter-Statement of Facts

Hatten's counsel filed a brief in opposition to the Defendants' motions on legal grounds. (Doc. 23). Hatten himself subsequently filed three *pro se* declarations pursuant to 28 U.S.C. § 1746, in which he provided factual statements regarding his efforts to exhaust administrative remedies and his version of the facts regarding the July 16th and July 25th incidents. (Doc. 34).

With respect to the July 16th event, Hatten stated that Defendants Miller and Crawley, as well as other officers, appeared at his cell door to escort him for his daily shower. Hatten contends that he complied with Miller's instruction to place his hands through the food slot for application of restraints. Once secured, Hatten claimed that it was Crawley who assaulted him, pulling Hatten's wrists through the slot.[10] Once his wrists were

---

[10] To the extent that Hatten claims he did not assault Crawley, he is precluded from challenging this finding by the prison disciplinary hearing officer without first obtaining a writ of habeas corpus invalidating the disciplinary hearing and resulting sanctions. *See generally Edwards v. Balisok*, 520 U.S. 641 (1997).

released, Hatten claimed he was told to back away from the door, and he complied. Hatten claimed that he and his cellmate were then escorted outside the cell where both were searched by the officers. The cellmate was then escorted away to take his daily shower, while Miller instructed Crawley and the other officers to hold Hatten outside his cell until Miller retrieved hand and leg restraints. When Miller returned, Hatten claimed that Miller ordered the officers to escort Hatten up a flight of stairs to another room, where Miller "verbally threaten[ed] to do bodily harm to [Hatten]." Miller allegedly told Hatten that he had been instructed by Defendant Fosnot and another supervisor to "kick [Hatten's] 'Black Ass' because [Hatten] [showed] no respect for staff," but that Miller had instead decided to have a use-of-force team assembled and have Hatten placed in "Extreme Hard Ambulatory Restraint." Hatten claimed that Miller then ordered the officers to return Hatten to Cell 316 and to leave him in restraints. (Doc. 34, at 32).

At some time later,[11] Hatten claimed that Miller returned with the July 16th UFT and ordered him to place his hands through the food slot to submit to hand restraints, and Hatten complied, despite already being secured in hand restraints. Hatten claimed he was then escorted out of the cell, stripped and dressed in paper clothing, and then secured in "Extremely Tight[] Hard Ambulatory Restraints With Black Box With Martin Chain" which was positioned incorrectly around Hatten's wrists, legs and upper chest. As a result of the leg restraints being too tight, Hatten claimed that he stumbled and fell partway through the long walk to D-Block, at which time the UFT members attacked him and secured him on a stretcher for the remainder of his move to D-Block. Hatten claimed that a chemical agent had been recently used to assist in the removal of the cell's previous residents, and that

---

[11] Hatten's declaration states that it was 2-1/2 hours later.

the cell remained "consumed" with noxious fumes that made it difficult for him to breathe the entire time he was held there. Hatten claims that he was finally released from the restraints 29-1/2 hours later

Hatten claims that, once restraints were removed, he had slight swelling, moderate tenderness, and superficial abrasions on the left side of his chest, as well as marks from the Martin chain around his chest, wrists, and legs, and "severe nerve damage" to his hands.

With respect to the July 25th event, Hatten claimed that he had requested to be moved to a new cell because his cellmate had assaulted him and that Hatten had been unable to defend himself due to the nerve damage he had suffered on July 16th. Following a medical evaluation, Hatten claimed that he had been confined in the video visiting room temporarily, awaiting return to his cell. While there, Defendant Zegarski, his case manager and the acting unit manager visited and spoke with him. Hatten claims to have pleaded his case for a cell reassignment to Zegarski, but Zegarski advised Hatten that he did not care what happened to him, that he would not move either Hatten or his cellmate, and that Hatten should have considered all this before he had filed lawsuits and administrative grievances against Zegarski and other officers. Later, Defendant Treibley appeared and informed Hatten that he needed to return to his assigned cell, and that a UFT would be deployed if he refused. Hatten claimed to have informed Treibley that his cellmate had assaulted him, and he refused to go back to the same cell.

At some time later, Treibley returned with the UFT and ordered him to submit to restraints, and Hatten complied. Hatten claimed he was then stripped and dressed in paper clothing, and secured in "extreme[ly] tight[] hard ambulatory restraints" on his wrists, legs, and upper chest. Once secured, Hatten was escorted back to his cell in D-Block without

incident.

E.  THE VIDEO FOOTAGE

The Defendants have submitted three DVDs under seal for *in camera* review. One DVD contains a copy of security camera footage shot from outside Cell 316 between 1:27 p.m. and 1:34 p.m. on July 16, 2011. The second DVD contains a copy of handheld video footage shot by the UFT between 2:12 p.m. and 2:32 p.m. on July 16, 2011. The third DVD contains a copy of handheld video footage shot by the UFT between 3:48 p.m. and 4:05 p.m. on July 25, 2011.

The first video depicts the incident in which Crawley applied hand restraints to Hatten through the door of Cell 316 on July 16, 2011. This is the incident where Hatten was later charged and found guilty by a disciplinary hearing officer for grabbing Crawley's hand and yanking it through the food slot, causing an abrasion to Crawley's fingers. The subsequent authorization of a UFT was based on this incident. The video footage is grainy and there is no audio, but it appears to corroborate Crawley's story and the disciplinary hearing officer's findings with respect to Hatten's pulling Crawley's hand into the food slot. But it also appears to corroborate Hatten's declaration, in which he claims to have been held outside his cell for a period of time, without incident, led off the tier to another location, and then returned to his cell and left in restraints for some period of time until the UFT arrived. Indeed, the Court notes that the video depicts Hatten standing in place outside his cell for a period of four minutes without incident, with three correctional officers standing in relaxed poses, after which Hatten was led through a door and out of camera shot in hand restraints only, immediately after which the video ends.

The second video depicts the UFT's transportation of Hatten from Cell 316 in I-

Block to Cell 126 in D-Block on July 16, 2011. At the start of the video, Hatten had been returned to his cell and he remained in hand restraints.[12] He offered no resistance as the UFT removed him from his cell and placed him in ambulatory restraints. While being escorted some distance to D-Block, Hatten stumbled and fell, called out "I fell, I fell, I'm sorry," and the UFT members secured him to a stretcher and carried him the rest of the way.[13] Hatten was then removed from the stretcher and placed in his new cell. At the end of the video, Miller and the members of the UFT conducted a short debriefing, in which Miller acknowledged that Hatten appeared to have tripped, that the UFT members may have perceived this as resistance, and that they then secured Hatten to a stretcher as a precautionary measure.

The third video depicts the UFT's transportation of Hatten from the video visiting room to his cell on July 25, 2011. Upon arrival of the UFT at the video visiting room, Hatten was instructed to place his hands through a slot in the door for application of hand restraints. He complied and hand restraints were applied. Hatten was then removed from the cell by the UFT and placed in ambulatory restraints. He was then escorted to his cell by the UFT without incident.

## II.   STANDARD OF REVIEW

### A.   RULE 12(B)(1) STANDARD FOR DISMISSAL FOR LACK OF JURISDICTION

The plaintiff bears the burden of establishing the existence of subject matter jurisdiction when challenged under Rule 12(b)(1). *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926

---

[12] It is not initially clear from the video footage that Hatten was still in hand restraints, but the UFT can be seen removing them several minutes later as they dressed Hatten in paper clothing, and during the debriefing at the end of the video, Miller expressly acknowledged that Hatten was already in hand restraints at the start of the exercise.

[13] The video does not appear to support Hatten's claim that they "attacked" him.

F.2d 1406, 1409 (3d Cir. 1991). A defendant may challenge the existence of subject matter jurisdiction in one of two fashions: it may attack the complaint on its face or it may attack the existence of subject matter jurisdiction in fact, relying on evidence beyond the pleadings. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Where a defendant attacks a complaint as deficient on its face, "the court must consider the allegations of the complaint as true." *Mortensen*, 549 F.2d at 891. "In deciding a Rule 12(b)(1) facial attack, the court may only consider the allegations contained in the complaint and the exhibits attached to the complaint; matters of public record such as court records, letter decisions of government agencies and published reports of administrative bodies; and 'undisputably authentic' documents which the plaintiff has identified as a basis of his claims and which the defendant has attached as exhibits to his motion to dismiss." *Medici v. Pocono Mountain Sch. Dist.*, No. 09-CV-2344, 2010 WL 1006917, at *2 (M.D. Pa. Mar. 16, 2010). However, when a motion to dismiss attacks the existence of subject matter jurisdiction in fact, "no presumptive truthfulness attaches to plaintiff's allegations," and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen*, 549 F.2d at 891.

B. RULE 12(B)(6) STANDARD FOR DISMISSAL FOR FAILURE TO STATE A CLAIM

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility."

*Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Although the Court must accept the allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). In deciding a Rule 12(b)(6) motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### C.  RULE 56 STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant

makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

## III.   DISCUSSION

### A.   *BIVENS* CLAIMS AGAINST THE BOP

In the BOP's first motion (Doc. 6), it moves to dismiss Hatten's *Bivens* claims against the BOP under Rule 12(b)(1) for lack of subject matter jurisdiction. Sovereign immunity bars claims against the United States and its agencies, unless Congress has specifically waived such immunity. *United States v. Mitchell*, 463 U.S. 206, 215–16 (1983); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (sovereign immunity is not merely a defense to an action against the United States, but a jurisdictional bar). Any claims by Hatten against the BOP are barred unless the immunity has been waived. *See Jorden v. Nat'l Guard Bureau*, 799 F.2d 99, 102 n.3 (3d Cir. 1986). The complaint asserts no such waiver with respect to Hatten's *Bivens* claims. *Malone v. Bowdoin*, 369 U.S. 643, 645 (1962) (claimant must plead source of waiver of sovereign immunity).

Accordingly, it is recommended that the Defendant's first motion (Doc. 6) be granted and Count One and Count Two of the complaint be dismissed with respect to the BOP as barred by sovereign immunity.

### B.   FTCA CLAIMS AGAINST THE BOP

The complaint does assert a waiver of the BOP's sovereign immunity under the FTCA with respect to Count Three (general negligence), Count Four (negligent failure to train or supervise), and Count Six (malpractice). The FTCA provides a remedy in damages for the simple negligence of employees of the United States. *See United States v. Muniz*, 374 U.S. 150, 150 (1963). Under the FTCA, sovereign immunity is waived against persons suing

the federal government for the commission of various torts. *See Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003). "[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 305 (1992); *see also* 28 U.S.C. § 2674.

The Defendants' second motion (Doc. 10) nevertheless seeks the dismissal of Hatten's FTCA claims against the BOP under Rule 12(b)(1) for lack of subject matter jurisdiction. "[T]he United States is the only proper defendant in a suit for personal injuries arising out of the negligence of federal employees. Individual agencies of the United States may not be sued in their own name in such a case." *Dilg v. U.S. Postal Serv.*, 635 F. Supp. 406, 407 (D.N.J. 1986) (citation omitted); *see also CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008); *Garcia v. United States*, No. 3:12-1978, 2013 WL 433538, at *1 (M.D. Pa. Feb. 5, 2013); *Huberty v. U.S. Ambassador to Costa Rica*, No. 3:07-CV-1420, 2007 WL 3119284, at *4 (Oct. 22, 2007); *Culver v. United States*, No. 3:06cv1865, 2007 WL 3052994, at *3 (M.D. Pa. Oct. 17, 2007). "Furthermore, strict adherence with the terms and requirements of the FTCA is jurisdictional and cannot be waived." *Dilg*, 635 F. Supp. at 407 (dismissing FTCA claim against U.S. Postal Service for lack of subject matter jurisdiction); *Garcia*, 2013 WL 433538, at *1 (Department of Veteran Affairs); *Huberty*, 2007 WL 3119284, at *4 (U.S. Ambassador); *Culver*, 2007 WL 3052994, at *3 (Department of Veteran Affairs). Accordingly, Hatten's FTCA claims against the BOP are barred by sovereign immunity.

Rather than dismissal pursuant to Rule 12(b)(1), the appropriate response in this case is substitution of the United States as a defendant in place of the BOP. *See Garcia*, 2013 WL 433538, at *1 (dismissing Department of Veteran Affairs and substituting the United States as defendant in its place). Hatten's FTCA claims were denied by the BOP on July 31, 2012.

(Doc. 22-1, at 3). The six-month FTCA limitations period for these claims therefore expired on January 31, 2013. *See* 28 U.S.C. § 2401(b). Counsel for Hatten filed a certificate of service in this case attesting that, on January 30, 2013, the complaint in this matter was served by certified mail addressed to the BOP, to the civil-process clerk at the United States Attorney's Office in this judicial district, and to the Attorney General of the United States. (Doc. 5). Under Rule 4(i), this constituted proper service on the BOP, and it would have likewise constituted proper service on the United States if it had been properly designated as a defendant. *See* Fed. R. Civ. P. 4(i)(1)&(2). Under these circumstances, amendment of the complaint to substitute the United States as a defendant to the FTCA claims in place of the BOP relates back to the original complaint. *See* Fed. R. Civ. P. 15(c) (allowing relation back of amendment substituting the United States as a party where process was timely mailed to the United States attorney or his designee, or to the Attorney General of the United States); *see also McGuckin v. United States*, 918 F.2d 811, 812 (9th Cir. 1990) (substitution of United States for BOP related back where original complaint was served on United States Attorney within FTCA limitations period); *Slade v. U.S. Postal Serv.*, 875 F.2d 814, 816 (10th Cir. 1989) (substitution of United States for USPS related back where original complaint was mailed to United States Attorney and Attorney General on the last day of the FTCA limitations period); *Ezenwa v. Gallen*, 906 F. Supp. 978, 985 (M.D. Pa. 1995) (substitution of United States for federal officer related back where original complaint was timely served on United States Attorney and the Attorney General).

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be granted with respect to dismissal of the FTCA claims against the BOP, but that the United

States be substituted as a defendant in place of the BOP, and that Counts Three and Four[14] proceed as against the United States.

### C. HATTEN'S "MALPRACTICE" CLAIM

In Count Six, Hatten asserts a claim of "malpractice," alleging that the Defendants failed to provide security services consistent with the relevant standard of care applicable to the provision of penological services. "In order to establish a claim for professional malpractice under Pennsylvania law plaintiff must demonstrate three basic elements: (1) employment of the professional or other basis for a duty; (2) the failure of the professional to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of damage to the plaintiff." *U.S. Airways, Inc. v. Elliott Equip. Co, Inc.*, No. 06-1481, 2008 WL 4461848, at *3 (E.D. Pa. Sept. 29, 2008). Under Pennsylvania law, however, a professional malpractice claim "can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers . . . ; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys." *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, MDL No. 1712, 2007 WL 2541216, at *32 (E.D. Pa. Aug. 29, 2007) (citing Pa. R. Civ. P. 1042.1). Correctional officers are not among the enumerated professions for which a special duty of care applies.

Accordingly, it is recommended that the Court *sua sponte* dismiss Count Six of the complaint for failure to state a claim upon which relief can be granted. *See* 28 U.S.C. § 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

---

[14] Dismissal of Count Six for failure to state a claim is recommended below.

D. Claims Against Warden Bledsoe

The Defendants seek the dismissal of Hatten's *Bivens* claims against Warden Bledsoe under Rule 12(b)(6) for failure to state a claim. In particular, the Defendants contend that the complaint fails to allege any personal involvement by Warden Bledsoe in the events giving rise to Hatten's *Bivens* claims.

"Civil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, __ F. Supp. 2d ___, 2014 WL 1235778, at *7 (M.D. Pa. Mar. 25, 2014). As previously explained by the Third Circuit:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.
>
> *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (addressing § 1983 claim); *Millbrook*, 2014 WL 1235778, at *8 (quoting *Rode* in the *Bivens* context).

The complaint fails to allege any personal involvement whatsoever by Warden Bledsoe. The only facts alleged with respect to Bledsoe concern his supervisory role as warden of the prison where the alleged excessive use of force and deliberate indifference took place.

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be granted with respect to dismissal of *Bivens* claims against Warden Bledsoe, and that Count One and Count Two of the complaint be dismissed with respect to Warden Bledsoe for failure to state a claim upon which relief can be granted.

E. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before bringing a *Bivens* action concerning prison conditions, a prisoner must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). Failure to exhaust administrative remedies is an affirmative defense that must be pleaded and proven by the defendant. *Ray v. Kertes*, 385 F.3d 287, 295 (3d Cir. 2002) ("Prison officials are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners.") (alteration omitted). Moreover, § 1997e(a) requires "proper" exhaustion of administrative remedies, meaning strict compliance with BOP deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 89–95 (2006). "A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *McKinney v. Kelchner*, No. 1:CV-05-0205, 2007 WL 2852373, at *3 (M.D. Pa. Sept. 27, 2007) (citing *Spruill v. Gillis*, 372 F.3d 218, 227–32) (3d Cir. 2004).

The BOP has established a multi-stage administrative remedy process through which an inmate may seek formal review of an issue related to any aspect of his confinement. *See* 28 C.F.R. § 542.10 *et seq.*; *see also Nyhuis*, 204 F.3d at 77 n.12 (describing the administrative remedy process). At the first stage, the inmate is required to present an issue of concern *informally* to staff in an attempt to informally resolve the issue without a formal request for an administrative remedy. 28 C.F.R. § 542.13(a). If unable to satisfactorily resolve the issue

19

informally, the inmate must file a formal written administrative remedy request on BOP Form BP-9. 28 C.F.R. § 542.14(a). Ordinarily, the inmate's BP-9 must be submitted to the Warden within 20 calendar days following the date on which the basis for the administrative remedy request occurred. 28 C.F.R. § 542.14(a). If dissatisfied with the Warden's response, the inmate may submit a written appeal to the appropriate Regional Director on BOP Form BP-10. 28 C.F.R. § 542.15(a). Ordinarily, the inmate's BP-10 must be submitted within 20 calendar days of the date the Warden signed his or her response. 28 C.F.R. § 542.15(a). If dissatisfied with the Regional Director's response, the inmate may submit a written appeal to the BOP's General Counsel on BOP Form BP-11. 28 C.F.R. § 542.15(a). The inmate's BP-11 must be submitted within 30 calendar days of the date when the Regional Director signed his or her response. 28 C.F.R. § 542.15(a). This review by the BOP's General Counsel is the final administrative appeal for administrative remedy requests by federal prisoners. 28 C.F.R. § 542.15(a). The BOP regulations expressly provide for the extension of these deadlines in a variety of circumstances. *See* 28 C.F.R. § 542.14(b)(1); 28 C.F.R. § 542.15(a).

The Defendants contend that Hatten failed to exhaust his administrative remedies with respect to either of the two incidents giving rise to his excessive force / deliberate indifference claims. In support, they have submitted the Declaration of Jennifer Knepper (Doc. 22-1), an attorney at USP Lewisburg, attached to which is a printout of Hatten's complete administrative remedy history (Doc. 22-1, at 7–50) in chronological order through March 6, 2013. In her declaration, Knepper states that she has examined those administrative remedy requests filed between July 11, 2011, the date of the first incident at issue, and January 28, 2013, the date when the complaint was filed in this case. She has

identified a list of 16 fully exhausted administrative remedy requests filed after July 11, 2011. (Doc. 22-1, at 2). Knepper's declaration does not advise how she determined that these administrative remedy requests were exhausted, or how she determined that other, unlisted requests were not exhausted.

A comparison of the list of 16 "fully exhausted" requests identified by Knepper and the full list of Hatten's administrative remedy requests reveals that several of the requests she identified concern events that pre-date the July 2011 incidents considerably. Requests No. 63038 and No. 63045 appear to have been initially submitted to the Warden in March 2011. (Doc. 22-1, at 32). Request No. 637701 was initially submitted in May 2011. (Doc. 22-1, at 35). Several (641315, 643382, and 644491) are actually appeals from disciplinary hearings held in May 2010, April 2011, and June 2011. (Doc. 22-1, at 2; Doc. 22-1, at 35, 37).

Moreover, in reviewing the complete list, there are several administrative remedy requests filed close in time to the July incidents that are omitted from Knepper's short list. One of them, No. 648018, concerning an unspecified "staff complaint," was initially submitted to the Warden on July 18, 2011, and rejected or denied that same day. (Doc. 22-1, at 39). Hatten then submitted an administrative appeal of this request to the Regional Director, which is logged as having been received on November 7, 2011,[15] and rejected or denied three days later on November 10, 2011. (Doc. 22-1, at 41). Hatten then submitted an administrative appeal of this request to the BOP's General Counsel, which is logged as

---

[15] Although this is clearly more than 20 calendar days after the Warden's denial of Hatten's facility-level administrative remedy request, without a copy of these materials, it is impossible to ascertain when Hatten actually submitted the request, whether Hatten may have advanced a valid reason for the delay, or whether he was granted an extension of time to file his appeal. *See* 28 C.F.R. § 542.15(a); 28 C.F.R. § 542.14(b)(1).

having been received on December 16, 2011, and rejected or denied three weeks later on January 6, 2012. (Doc. 22-1, at 42). Hatten subsequently resubmitted this same request several more times for reconsideration at the facility and regional levels. (Doc. 22-1, at 42, 44). The substance of this "staff complaint" administrative remedy request is unclear, but its initial filing just two days after the July 16, 2011, incident and its subsequent presentation at all levels of the administrative review process, suggest that the summary of administrative remedy requests set forth in Attorney Knepper's declaration is less than comprehensive, and not entirely reliable as evidence in support of the Defendants' failure-to-exhaust defense.

This is further underscored by the substance of the only administrative remedy request file that has been submitted into the record by the Defendants for consideration on summary judgment. In support of her declaration, Knepper has attached a copy of papers that document some of the administrative proceedings on another of Hatten's remedy requests, No. 679902, which Knepper has ascertained to be at issue in this case. (Doc. 22-2, at 2–7). On March 8, 2012, Hatten submitted this remedy request to the Warden, complaining that certain BOP employees were "impeding" him from effectively exhausting his administrative remedies. (Doc. 22-2, at 2). The request appears to reference several prior remedy requests, without detailing the nature of whatever other requests he was not being permitted to exhaust, nor the specific nature of the obstruction he was encountering. (Doc. 22-2, at 2). Twelve days later, on March 20, 2012, the Warden provided an informational response, advising Hatten that the prior requests had all been rejected as untimely. (Doc. 22-2, at 3). Curiously, the comprehensive index of administrative remedy requests submitted by the Defendants documents different dates, logging this request as having been received at the facility level on March 14, 2012, and rejected or denied six days later on March 19,

2012. (Doc. 22-1, at 44). Hatten filed an administrative appeal with the Regional Director on March 22, 2012, which was logged in the comprehensive index as having been received on March 27, 2012. (Doc. 22-2, at 4; Doc. 22-1, at 45). On April 25, 2012, the Regional Director denied Hatten's administrative appeal. (Doc. 22-2, at 5; Doc. 22-1, at 45). Hatten filed a final administrative appeal to the BOP's General Counsel on May 1, 2012, which was logged in the comprehensive index as having been received on May 14, 2012. (Doc. 22-2, at 6; Doc. 22-1, at 46). On February 5, 2012, the BOP's General Counsel denied Hatten's final administrative appeal. (Doc. 22-2, at 7; Doc. 22-1, at 46). Notably, the comprehensive index includes several other administrative remedy requests that, based only on the concise descriptions in the index, appear to allege staff interference with the administrative remedy process. (*See, e.g.*, Doc. 22-1, at 39–46.)

As the Court previously noted, failure to exhaust administrative remedies is an affirmative defense that must be proven by the defendant. *Ray*, 385 F.3d at 295. The Defendants claim that Hatten has failed to exhaust available administrative remedies with respect to the July 16, 2011, and July 25, 2011, incidents. But the comprehensive index of Hatten's administrative remedy requests submitted by the Defendants themselves in support of their motion for summary judgment suggests that Hatten filed at least one potentially relevant administrative remedy request labeled "Staff Complaint" within a few days after the July 16th incident, and that he subsequently filed administrative appeals at all levels of the BOP administrative remedy process. Hatten has not had the opportunity to conduct any discovery into this matter as yet.[16] Moreover, the one administrative remedy request file that

---

[16] The Defendants' motion for summary judgment was filed without Hatten having had the opportunity to conduct any discovery into the exhaustion of administrative

was submitted for the record, pertaining to No. 679902, alleges that Hatten encountered obstructive conduct by certain BOP employees, "impeding" him from exhausting his administrative remedies, and the comprehensive index suggests the filing of several other grievances alleging staff interference or misconduct with respect to the administrative remedy process. Based on this apparently incomplete record, and viewing the evidence of record in the light most favorable to the non-moving party, the undersigned is unable to conclude that there is no genuine dispute as to any material fact and that the Defendants are entitled to judgment as a matter of law on the ground that Hatten failed to exhaust all available administrative remedies.

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be denied with respect to their request for summary judgment on the ground that Hatten failed to exhaust his administrative remedies.

### F. *BIVENS* CLAIMS ON THE MERITS

In the alternative, the Defendants contend that they are entitled to summary judgment on the merits of Hatten's *Bivens* claims. In Count One of the complaint, Hatten contends that he was subjected to the excessive use of force and to deliberate indifference to his well-being, in violation his Eighth and Fourteenth Amendment rights, when he was placed in excessively tight ambulatory restraints, "attacked" by guards while in ambulatory restraints, and left in restraints for an excessive period of time. In Count Two of the complaint, Hatten contends that the same conduct by the Defendants was in retaliation for his filing of grievances against prison officials, and thus in violation of his First and

---

remedies, nor into any other disputed fact issues. Hatten's primary argument in response is that summary judgment is premature without discovery into the exhaustion issue. *See* Fed. R. Civ. P. 56(d). Under these circumstances, it is a persuasive argument.

Fourteenth Amendment rights.

### 1.   Eighth Amendment Claims

"After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.' Any protection that [the Fourteenth Amendment] affords convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)) (citation omitted).

The Eighth Amendment protects prisoners from cruel and unusual punishment, including "the unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). To prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

There are different standards for Eighth Amendment violations depending on the type of claim. An Eighth Amendment challenge to prison conditions is subject to the deliberate indifference standard. *See Farmer*, 511 U.S. at 835–36. Prison officials are deliberately indifferent when they know of and disregard a substantial risk of harm to a prisoner. *Farmer*, 511 U.S. at 836. Moreover, a prisoner must produce evidence of serious or significant physical or emotional injury resulting from the challenged prison condition. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). An Eighth Amendment challenge asserting excessive force is subject to a malicious and sadistic standard. The inquiry under this standard is whether prison officials applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Hudson*, 503 U.S. at 6. In an excessive force case, a prisoner need not show significant injury; however, an objectively *de minimis* use of force is insufficient to establish an Eighth Amendment violation. *Hudson*, 503 U.S. at 9–10.

> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

*Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

Hatten claims that the Defendants subjected him to excessive force when they placed him in ambulatory restraints and escorted him from one cellblock to another on July 16, 2011, including what he has alleged to be an "attack" on him by the UFT members when he stumbled and fell. He claims that there was no need for the application of ambulatory restraints or the use of a use-of-force team. Indeed, he claims that Defendant Miller explicitly threatened him and advised him that the UFT was being assembled to cause him harm. As a result of this incident, Hatten claims to have suffered intense pain and permanent scarring, as well as difficulty breathing and swelling in the area of his chest where a tight chain was applied. Meanwhile, the Defendants contend that the minimum necessary amount of force was used to transport Hatten to his new cell, that it was utilized in response to Hatten's physical assault of Defendant Crawley. Video footage appears to corroborate the Defendants' characterization of the level of force used by the UFT, but it also appears to corroborate Hatten's claims that he was removed from his cell and met with Miller in another location after the assault on Crawley, and that he was then returned to his cell in hand-restraints before the UFT arrived to transport him to D-Block. Most salient,

perhaps, is the video footage of a four minute period in which Crawley and other officers stood with an apparently calm Hatten outside his cell, before escorting Hatten out of the cell area without incident, and without the need for ambulatory restraints or a UFT. Based on this evidence, a reasonable jury could conclude that the amount of force used on July 16, 2011, was excessive under the circumstances presented, and thus summary judgment for the Defendants on this issue is inappropriate.

Hatten further claims that the Defendants subjected him to excessive force a second time when they placed him in ambulatory restraints and escorted him from one cellblock to another on July 25, 2011. He claims that there was no need for the application of ambulatory restraints or the use of a use-of-force team, but he acknowledges that he initially refused to return to his cell when directed to do so by Defendant Treibley, ostensibly because he feared being assaulted by his cellmate, having been assaulted by him already on the previous day. Although he denies having done so, Hatten is precluded in this action from challenging the disciplinary hearing officer's adjudicative finding that he had threatened to harm his cellmate. Regardless, Hatten claims that the UFT applied the ambulatory restraints in such a manner as to cause him intense pain, spasms, and difficulty breathing. Meanwhile, the Defendants contend that the minimum necessary amount of force was used to transport Hatten back to his cell, and that it was utilized in response to Hatten's threat to his cellmate and his refusal to comply with Defendant Treibley's orders. Video footage corroborates the Defendants' characterization of the level of force used by the UFT. Although the video offers no insight into degree of subjective pain Hatten may have suffered, he voiced no complaints and he was not visibly impaired or harmed. Given the irrebuttable finding of the disciplinary hearing officer that Hatten had threatened to harm his

inmate, his admitted refusal to return to his cell, and the other evidence of record, no reasonable jury could conclude that the amount of force used on July 25, 2011, was excessive under the circumstances presented, and thus summary judgment for the Defendants on this issue is appropriate.

Hatten also claims that, on both occasions, the Defendants left him in restraints for an extended period of time after he was transported and secured in his cell. The Defendants have adduced evidence to establish that, following the July 16th incident, Hatten was released from restraints after 25½ hours, which Hatten has disputed by a declaration based on his personal knowledge, attesting that he was left in restraints for a total of 29½ hours.[17] The Defendants have also adduced evidence to establish that, following the July 25th incident, Hatten was released from restraints after 5½ hours, and Hatten has identified no contradictory evidence in the record.[18] The Defendants have produced logs documenting that staff members checked his general welfare every fifteen minutes throughout both periods, that lieutenants checked his general welfare and evaluated his demeanor every two hours throughout both periods, and that medical personnel evaluated his health status twice during each eight-hour shift. Hatten has identified no evidence whatsoever of serious or significant physical or emotional injury resulting from these periods during which he was in restraints, and the Defendants have submitted medical records that document no significant injuries attributable to his placement in restraints. It is not a close question. Based on these facts, and applying the deliberate indifference standard, there is no genuine dispute as to any

---

[17] The complaint alleged that Hatten was left in restraints for three days. He has tempered his time estimate somewhat in his declaration.

[18] The complaint alleged that Hatten was left in restraints for 18 hours. His declaration does not address this particular fact.

material fact and the Defendants are entitled to judgment as a matter of law with respect to Hatten's deliberate indifference claims arising from his extended placement in restraints. *See Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999) (ambulatory restraints for 24 hours); *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (four-point restraints for 28 hours); *Hunter v. Bledsoe*, No. 1:CV-10-0927, 2010 WL 3154963 (M.D. Pa. Aug. 9, 2010) (ambulatory restraints used for 24 hours); *Holley v. Johnson*, No. 7:08CV00629, 2010 WL 2640328 (W.D. Va. June 30, 2010) (ambulatory restraints used for 48 hours); *Moore v. Miller*, No. 7:08CV00614, 2009 WL 113258 (W.D. Va. Jan. 15, 2009) (ambulatory restraints for 26 hours); *Keyes v. O'Brien*, No. 7:06CV00437, 2006 WL 2125912 (W.D. Va. July 27, 2006) (ambulatory restraints for 30 hours); *Garraway v. United States*, No. 04-CV-01049, 2006 WL 3054606 (D. Colo. July 24, 2006) (magistrate judge report) (ambulatory restraints for 50 hours), *adopted in part, rejected in part on other grounds*, 2006 WL 2772707 (D. Colo Sept. 25, 2006); *Saleh v. Ray*, No. 02-3241, 2003 WL 23484639 (D. Kan. Nov. 12, 2003) (ambulatory restraints for 18 to 24 hours).

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be granted with respect to their request for summary judgment on Hatten's excessive force claim arising out of the July 25, 2011, incident, and Hatten's deliberate indifference claims arising out of the July 16, 2011, and July 25, 2011, incidents, but denied with respect to their request for summary judgment on Hatten's excessive force claim arising out of the July 16, 2011, incident.

## 2. Retaliation Claim

To prevail on a retaliation claim a prisoner must establish the following elements: (1) constitutionally protected conduct; (2) an adverse action by prison officials that is sufficient

to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). The Defendants do not dispute that Hatten has met the first two elements of a retaliation claim. The Defendants acknowledge that "[t]he filing of grievances is protected under the First Amendment." *Kelly v. York County Prison*, 340 Fed. App'x 59, 61 (3d Cir. 2009) (per curiam). They further concede that placement in ambulatory restraints, the use of force, and the extended detention in restraints exhibited in this case, which Hatten claims caused him pain and permanent scarring, are adverse actions sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See Busey v. Smith*, No. 1:12-cv-469, 2014 WL 1491210, at *11 (M.D. Pa. Apr. 15, 2014) (finding allegation that inmate "suffered pain and an injury to his right knee" sufficient to establish "an adverse action that would deter a prisoner of ordinary firmness from exercising his constitutional rights"). But the Defendants contend that Hatten has failed to establish the third element, a causal link between Hatten's filing of grievances and the adverse action taken in this case.

To evaluate the existence of a causal link, the Third Circuit has adopted a burden-shifting analysis: the prisoner-plaintiff bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to take adverse action against him; but once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have taken the same adverse action even in the absence of the protected activity, for reasons reasonably related to penological interest. *Carter v. McGrady*, 292 F.3d 152, 157–58 (3d Cir. 2002); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Hatten has provided declarations in

which he attests to conversations with Defendants Miller and Zegarski just prior to each of the uses of force at issue in this case, in which Hatten was informed that these defendants and other prison officials were engaged in a scheme of retaliation against Hatten for filing lawsuits and grievances.

Hatten having made his *prima facie* case, the burden of proof then shifts to the Defendants, who contend that they would have taken the same adverse action in the absence of Hatten's filing of grievances, for reasons reasonably related to penological interest. In particular, the Defendants contend that the July 16th use of force and imposition of restraints would have been undertaken in any event due to Hatten's assault on Defendant Crawley, and they contend that the July 25th use of force and imposition of restraints would have been undertaken in any event due to Hatten's threat to harm his cellmate. In both instances, the Defendants also rely on the subjective observations of prison officials that Hatten was displaying unspecified "signs of imminent violence." However, the video footage submitted in this case casts a cloud over the Defendants' contentions. In both UFT videos, there is no apparent sign of aggression or imminent violence, and Hatten appears compliant, even apologizing to the UFT members when he trips and falls during the July 16th incident. The security camera footage from the July 16th incident, showing Hatten apparently waiting calmly for four minutes with three officers — each of whom appears to be relaxed and largely unconcerned by any security threat — before being escorted off camera without incident, several minutes after the assault on Crawley and more than thirty minutes before the UFT deployed to retrieve him from his cell. Viewing the evidence in the light most favorable to Hatten, the non-movant, a reasonable jury could conclude that the reasons offered by the Defendants are pretextual, and that they would not have taken the

same adverse action in the absence of Hatten's exercise of his First Amendment right to file grievances.

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be denied with respect to summary judgment on Hatten's retaliation claim.

### G. QUALIFIED IMMUNITY

The Defendants assert that they are entitled to qualified immunity. Qualified immunity provides not merely a "defense to liability," but rather "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). It is therefore important to "resolv[e] immunity questions at the earliest possible stage in the litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Certain officials performing "discretionary functions" are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Pearson*, 555 U.S. at 231. Also, if an official reasonably believes his conduct to be lawful, he is protected by qualified immunity, which affords "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010).

A qualified immunity determination involves two distinct inquiries. The first inquiry evaluates whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). The second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. *Pearson*, 555 U.S. at 231–32; *Saucier*, 533 U.S. at 201–02. A right is "clearly established" if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. *Broadwater v. Fow*, 945 F. Supp. 2d 574, 585 (M.D. Pa. 2013). The court may exercise its

discretion in deciding which of the two inquiries should be addressed first. *Pearson*, 555 U.S. at 240.

The Defendants do not contend that the rights in question were not clearly established, and they do not claim that they reasonably believed their conduct to be lawful. Rather, the Defendants assert qualified immunity on the sole ground that they did not violate Hatten's constitutional rights. For the reasons stated above in evaluating the merits of Hatten's, there remain genuine disputes of material fact with respect to Hatten's July 16th excessive force and his retaliation claim.

Accordingly, it is recommended that the Defendants' second motion (Doc. 10) be denied with respect to summary judgment on the issue of qualified immunity.

## IV.  RECOMMENDATION

Based on the foregoing, it is recommended that:

1.  The Defendants' first motion to dismiss (Doc. 6) be **GRANTED**;

2.  The Defendants' second motion to dismiss and for summary judgment (Doc. 10) be **GRANTED** in part and **DENIED** in part, as follows:

   a.  Counts One and Two of the complaint asserting *Bivens* claims be **DISMISSED** as against the Bureau of Prisons on sovereign immunity grounds, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure;

   b.  Counts One and Two of the complaint asserting *Bivens* claims be **DISMISSED** as against Bryan Bledsoe for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure;

   c.  The United States be **SUBSTITUTED** in place of the Bureau of Prisons as a defendant to Counts Three and Four of the complaint, asserting claims under the Federal Tort Claims Act, and the Bureau of Prisons otherwise be **TERMINATED** as a defendant in this case;

   d.  Count Six of the complaint asserting a malpractice claim be

**DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) and 42 U.S.C. § 1997e(c)(1) for failure to state a claim;

e.  Judgment be **ENTERED** in favor of the Defendants with respect to Count One to the extent that it asserts an Eighth Amendment excessive force claim arising out of the events of July 25, 2011, pursuant to Rule 56 of the Federal Rules of Civil Procedure;

f.  Judgment be **ENTERED** in favor of the Defendants with respect to Count One to the extent that it asserts an Eighth Amendment deliberate indifference claim with respect to the Plaintiff's claim that he was held in restraints over an extended period of time on July 16, 2011, and again on July 25, 2011, pursuant to Rule 56 of the Federal Rules of Civil Procedure; and

3.  The case be remanded to the undersigned for further proceedings.

**BY THE COURT:**

**Dated: August 4, 2014**

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

34

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY LEE HATTEN,

                    Plaintiff,          |       CIVIL ACTION NO. 1:13-CV-00209

      v.                            |            (CALDWELL, J.)

BRYAN BLEDSOE, Warden, et al.,  |         (MEHALCHICK, M.J.)

                  Defendants    |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **August 4, 2014**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: August 4, 2014

                                  *s/ Karoline Mehalchick*

                                  **KAROLINE MEHALCHICK**
                                  **United States Magistrate Judge**